Robert F. URBANO, Appellant,

v.

The BOARD OF MANAGERS OF the NEW JERSEY STATE PRISON.

No. 17475.

United States Court of Appeals Third Circuit.

Submitted on Briefs Feb. 17, 1969.

Decided Sept. 5, 1969.

**248**

———◆———

Robert F. Urbano, pro se.

Eugene T. Urbaniak, Deputy Atty. Gen., Dept. of Institutions and Agencies, Trenton, N. J. (Arthur J. Sills, Atty. Gen. of New Jersey, on the brief), for appellee.

Before VAN DUSEN, ALDISERT and STAHL, Circuit Judges.

## OPINION OF THE COURT

STAHL, Circuit Judge.

This is a diversity suit by appellant, Robert F. Urbano, an inmate in the New Jersey State Prison, against the Board of Managers of the State Prison.[1] The suit was brought in the form of a class action[2] on behalf of all of the inmates of the institution who are alleged to be beneficiaries of an inmate trust or welfare fund[3] claimed to have been estab-

---

1. Appellant Urbano is presently serving a life sentence in the State Prison for murder. According to his complaint, Urbano was a citizen of Massachusetts prior to his incarceration. In view of the disposition we make of his appeal, we need not reach any definitive conclusion on the presence of diversity jurisdiction here. We do note that, problems of sovereign immunity aside, if the Board of Managers is a "citizen" of New Jersey, then Urbano's claimed Massachusetts citizenship is diverse because his presence in New Jersey is not a domicile of choice. See Hiramatsu v. Phillips, 50 F.Supp. 167 (S.D.Cal.1953). Furthermore, the individual members of the Board of Managers, not named in the complaint, against

whom relief is in part sought, are all required to be "residents" (presumably "citizens") of New Jersey. N.J.S.A. 30:4–1.

2. Again, because of the disposition of this case below and on appeal, the lower court did not consider, nor do we, whether a class action under Rule 23 is proper. See generally Washington v. Lee, 263 F. Supp. 327 (M.D.Ala.1966), aff'd per curiam, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), on the question of class actions in suits brought by prison inmates.

3. Although for convenience we adhere throughout the opinion to appellant's characterization of the fund involved in this litigation as a "trust fund" and to the

lished under two New Jersey statutes: N.J.S.A. 30:4–15, 30:4–67.1.[4]

According to appellant, the primary sources of the "trust fund," which has evidently been in existence for at least twenty years, and possibly longer, have been from

(a) a compulsory deduction from prisoners' wages up to a maximum of $10,[5] and

(b) profits from the sale of goods at the prison commissary.[6]

The fund may also have been the beneficiary of gifts from private individuals or groups [7] or from state appropriations. The record does not disclose the present value of the corpus of the trust fund.[8]

In his complaint appellant charges the members of the Board of Managers of the New Jersey State Prison with "mismanagement, waste and expenditures

prisoners as "beneficiaries," we make no holding as to the legal propriety of these labels or as to the correctness of the assertion that the cited statutes do in fact establish a trust.

In several opinions of the Attorney General of New Jersey, cited by appellant and referred to in the lower court's opinion, Appendix (App.) 32a–36a, 6a, the fund has been characterized as an "inmates' Welfare Fund * * * in the nature of a trust." (See, e. g., Op.Atty. Gen., September 15, 1950, No. 61, App. 32a–33a.) For the deference to be given by the federal courts to the opinions of a state attorney general in the absence of judicial construction of a statute, see In re Jackson, 268 F.Supp. 434, 443 (E.D. Mo.), aff'd sub nom., Zuke v. Mercantile Trust Co., 385 F.2d 775 (8th Cir. 1967). It should be noted, however, that the general denial contained in appellee's answer (App. 16a) to appellant's complaint (App. 13a) would seem to contest the establishment of a trust under the statutes hereinafter cited.

4. 30:4–15:

*Commissaries for sale of commodities to inmates, visitors and personnel*

The board of managers of any institution or noninstitutional agency set forth in section 30:1–7 of the Revised Statutes may maintain a commissary or store for the sale of commodities to patients, inmates, visitors and personnel under rules adopted by the board. The cost of establishing the commissary or store may be defrayed out of any funds appropriated for current maintenance. Any profit accruing may be used by the board for the use, benefit and general welfare of the inmate or patient population as a whole. As amended L.1966, c. 203, § 1.

30:4–67–1:

*Deposit and maintenance of funds of inmates; use of funds and interest*

The chief executive officer of any institution coming within the jurisdic-

tion of the Department of Institutions and Agencies is hereby empowered to deposit and maintain the funds of any inmate in a special fund for the use and benefit of said inmate, or for the payment of his maintenance in said institution, as a court of competent jurisdiction may by order direct. A general ledger shall be maintained in the office of each institution which shall contain a separate account for each inmate and indicate the amount on deposit for him.

Any interest paid by a bank or trust company wherein said fund is maintained may be utilized by the board of managers of said institution for the use, benefit and general welfare of the inmate population as a whole.

5. Deductions from prisoners' wages were discontinued in 1968, as indicated in appellant's brief. *See also* Harris v. Yeager, 291 F.Supp. 1015, 1016–1017 (D.N.J. 1968, aff'd per curiam, 410 F.2d 1376 (3d Cir. 1969).

6. See N.J.S.A. 30:4–15, note 4, *supra.*

7. N.J.S.A. 30:4–16.1.

8. Understandably appellant does not have access to the prison records relating to this fund. He filed interrogatories and sought discovery to examine the records. The request was denied as the district court dismissed the complaint.

For the purpose of this opinion, we assume, as asserted by appellant and not specifically controverted by appellee, that the corpus of the fund exceeds $10,000. Although we do not decide the issue, there is support for the proposition that where a breach of fiduciary duty is alleged, the corpus of the trust is the amount in controversy. *Cf.* Midstate Amusement Corp. v. Rivers, 54 F.Supp. 738 (E.D.Wash.1944).

contrary to * * * statutory provisions and not for the benefit of the inmate beneficiaries" and alleges that the benefits have not been "equally distributed among the beneficiaries as required by law." (App. 14a.)

Then, in his pro se brief, appellant Urbano claims that the members of the Board have used the trust fund moneys to cover "personal losses of officers from the Trust because the losses are attributed to the prisoners; subsidization of religious services * * *; purchase of airconditioners [sic] and other luxuries for private offices; use of confiscated food items intended for distribution to prisoners in the officers' mess of the prison * * *; etc." (Brief p. 13.)[9]

Appellant has asked for extensive relief, set forth in the margin,[10] on allegations which, if true, are not insubstantial. However, we choose to affirm the lower court's dismissal of the complaint, but on a different basis, namely, abstention.

### Decision of Lower Court

The district court dismissed the complaint on three alternative grounds.[11]

First, the court held that "a suit seeking to control the performance of the official duties of state officials is, in substance, a suit against the State, and is therefore barred by the Eleventh Amendment to the United States Constitution." [12]

■ We have some doubt concerning the appropriateness here of the application of the Eleventh Amendment. The conclusion that must be reached before the Eleventh Amendment may be interposed by appellant is that the state is the real party in interest. Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); [13] Harris v. Pennsylvania Turnpike Comm., 410 F.2d 1332, 1333 n. 1 (3d Cir. 1969); Citizens Committee for Hudson Valley v. Volpe, 297 F.Supp. 809, 810–811 (S.D.N.Y.1969); Jackson v. Colorado, 294 F.Supp. 1065, 1071–1072 (D.Col.1968).

In determining whether an "alter ego" status attaches to the instrumentality of a state, it has been said:

* * * [L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered,

9. The complaint generally charges waste and mismanagement. The allegations made in the brief may be tantamount to fraud which under F.R.Civ.P. 9(b) should have been stated with particularity.

10. Appellant demands in his complaint (App. 14a–15a):
(a) Recovery from defendants individually and severally of all funds improperly expended from the trust fund, including real assets, to the extent permitted by law;
(b) The imposition of punitive damages to the benefit of the trust fund to be determined after investigation;
(c) Determination that the beneficiaries of the trust must have a voice in the administration of the trust fund;
(d) Determination that the beneficiaries are entitled to periodic accountings of the trust fund;
(e) Determination that a prisoner may not be forced to contribute involuntarily to the inmate trust fund [see note 5, supra];
(f) An Order by this Court for an impartial audit as a preliminary measure to determine the instant demands to be paid from the trust fund;
(g) Payment to plaintiff from the trust fund of all of his expenditures in prosecuting the instant action; and
(h) For whatever other relief the Court may deem equitable and proper.

11. The opinion of the district court appears at App. 6a.

12. App. 9a. The Eleventh Amendment provides:
The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

13. * * * [W]hen the action is in essence one for the recovery of money from the state, the state is the real substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants. * * * 323 U.S. at 464, 65 S.Ct. at 350.

but only one of a number that are of significance.

Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations. Krisel v. Duran, 258 F.Supp. 845, 849 (S.D.N.Y.1966), *aff'd per curiam*, 386 F.2d 179 (2d Cir. 1967), *cert. denied*, 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968) (footnotes omitted).

*See also* the comprehensive treatment of the problems of immunity in S. J. Groves & Sons v. New Jersey Turnpike Authority, 268 F.Supp. 568 (D.N.J. 1967); Miller v. Vermont, 201 F.Supp. 930, 932 (D.Vt.1962); and Aerated Products Co. of Philadelphia v. Department of Health of State of New Jersey et al., 59 F.Supp. 652, 655, 660 (D.N.J. 1945), *aff'd*, 159 F.2d 851 (3d Cir. 1947). The court said in *S. J. Groves*:

> Counties and municipalities do not partake of the Eleventh Amendment immunity enjoyed by the States * *, although they clearly are public bodies

and in many cases perform functions on behalf of the State. * * *. Whether other bodies come under the Amendment depends on their relationship to the State, on the powers and responsibilities, the attributes and limitations, with which they have been endowed. * * * 268 F.Supp. at 574.

Appellant's claim for money damages, the most significant factor listed in *Krisel*, is not against the treasury of the state but against the individual members of the Board of Managers.[14] Moreover, the requested audit of the books of the trust fund would not seem to encroach directly upon the governmental functions of the state. As will be more fully developed later, however, since the authorizing statutes are not clear as to the status of the fund, and there are no state decisions regarding the "status and nature of the agency involved [*i. e.*, the Board of Managers] in its relation to the sovereign * * *," Krisel v. Duran, *supra*, the state courts should be given an opportunity to adjudicate these matters before a federal court intervenes.

We should note that in Kisielewski v. New Jersey, 68 N.J.Super. 258, 172 A.2d 203, *pet. for certification denied*, 36 N.J. 144, 174 A.2d 927 (1961), a comparable agency of New Jersey, the State Home for Girls, was held to be "purely an administrative subdivision of the government," and therefore the alter ego of the state for sovereign immunity purposes, in a negligence suit involving a claim for damages for personal injury to an inmate.[15]

---

14. As none of the members of the Board of Managers was named in the complaint, F.R.Civ.P. 10(a), it does not appear that the relief demanded of the Board members personally is proper. While individual members of a state agency do not have to be joined as party defendants in order to give a court jurisdiction to enjoin improper action by the *agency*. McCoy v. Louisiana State Board of Education, 345 F.2d 720 (5th Cir. 1965), it would not seem possible to secure per-

sonal relief, such as the punitive damages claimed here, without naming the members of the Board of Managers. In light of our disposition of the appeal, we do not need to resolve this issue directly.

15. The *Kisielewski* case did not involve the Eleventh Amendment, of course, but was a state court suit raising the question of whether the State Home for Girls could assert the same sovereign immunity as the State of New Jersey.

We do not believe that *Kisielewski* is dispositive of the "alter ego" question. In the first place, in the present action it is not the institution as such that is being sued, *i. e.*, the New Jersey State Prison, but the Board of Managers of the institution. Secondly, this is not a conventional negligence action but a suit charging the instrumentality in control of the New Jersey State Prison with breaches of fiduciary duty in the handling of a trust fund of which the prisoners are claimed to be the beneficiaries. It may be that in its capacity as trustee of an inmate trust fund, the Board of Managers has a different relationship to the sovereign for immunity purposes.

If it should be concluded that the Board of Managers is not the alter ego of the state, the Eleventh Amendment would probably pose no bar to an action in the federal court. The mantle of protection afforded to the states by the Eleventh Amendment prohibits suits against state officials, unless consent is given, where they operate under the authority granted by law and in accordance with the United States Constitution. Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); 3 Davis, Administrative Law § 27.01 (Supp.1965), § 27.03 (1958); 1 Barron and Holtzoff, Federal Practice and Procedure § 54.1 (Wright ed. 1960).

The Eleventh Amendment may not be used to shield activity which is lawless.[16] The allegations contained in appellant's complaint, which, if true, would indicate at least malfeasance in office, would be sufficient, we believe, to avoid the application of the Eleventh Amendment. At worst, appellant alleges criminal acts by state officials. Without any intimation as to the legitimacy of these charges, such conduct, if proven, cannot be swept under the Eleventh Amendment rug. We are not disposed, therefore, to dismiss this suit on the basis of the Eleventh Amendment. Cf. Whitner v. Davis, 410 F.2d 24, 29–30 (9th Cir. 1969).

The second ground for the lower court's dismissal of the complaint was that a New Jersey statute, N.J.S.A. 30:4–16,[17] "may be viewed as an express grant of immunity to defendants from any action seeking to hold them liable for the performance of their official duties." (App. 10a.)

Our research discloses no New Jersey case construing this statute. Although the interpretation of state statutes is generally left to the state courts, unless a constitutional violation is alleged, we perceive the language of the statute to deal primarily with the protection of various officials of state in-

16. In Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 462, 65 S.Ct. 347, 350 (1945), the Court said:
\* \* \* Where relief is sought under general law from wrongful acts of state officials, the sovereign's immunity under the Eleventh Amendment does not extend to wrongful individual action, and the citizen is allowed a remedy against the wrongdoer personally. \* \* \*
For a historical analysis of the doctrine, and a plea for its strict limitation, see Jaffe, Suits Against Government and Officers: Sovereign Immunity, 77 Harv. L.Rev. 1 (1963); Davis, Sovereign Immunity In Suits Against Officers For Relief Other Than Damages, 40 Cornell L.Rev. 3 (1955). A member of the Houston bar has even waxed poetic on the subject: Roady, Lee, Land, Larson and Malone—Sovereign Immunity Revisited, 43 Tex.L.Rev. 1062 (1965). *See generally* Annot., 160 A.L.R. 332 (1946).

17. Liability in law action
No action at law shall lie against any officer or employee or member of the state board or members of the several boards of managers, for admitting, receiving, keeping, detaining or transferring or discharging as provided by this title or directed by any order made in accordance with this title, any person coming to an institution or noninstitutional agency on his own application, or on the application of his friends or relatives, or by order of a judge or court of this state, but such application or order, or certified copy thereof, shall be sufficient warrant and authority for the admission, keeping, detention, transfer, discharge or reasonable care, treatment, management and control of any patient or inmate received or committed according to the terms of this title.

stitutions, engaged in the different phases of the detention of inmates, from suits in the nature of false imprisonment. Whether this statute can also serve to grant immunity to officials alleged to have mismanaged a trust fund established for the benefit of prisoners, even though there is a reference in the act to the "management" of inmates, is far from clear, and we do not believe it is proper to dispose of the complaint on this ground.[18] As we are constrained to dismiss this action under the doctrine of abstention, it will be up to the state courts, if this suit is pressed further, to gauge the applicability of this statutory grant of immunity to the facts here.[19]

The third ground for the decision below was the court's hesitancy to interfere with the discipline of state prisoners, in the absence of any allegation of deprivation of constitutional rights, citing Negrich v. Hohn, 379 F.2d 213 (3d Cir. 1967), and Gurzynski v. Yeager, 339 F.2d 884 (3d Cir. 1964).

Whether the action of a federal court would result in "interference with state prison discipline" in the sense of the *Negrich* and *Gurzynski* cases requires a careful analysis of the nature of the conditions about which appellant complains. Certain elements of the relief he seeks, note 10 *supra*, would not seem to interfere with the day-to-day regulated activities of appellant and his fellow prisoners. If the allegations made are true and mismanagement has occurred, an audit of the books of the trust fund, as well as possible recovery of damages for the benefit of the fund and other aspects of the relief requested, may not materially interfere with the institution's control of appellant or of the inmates generally.

### Abstention

The interrelationship between the putative trust created by N.J.S.A. 30:4–5 and 30:4–67.1 with the administration of the New Jersey State Prison makes this case singularly fitting for the application of the abstention doctrine.

Thus we affirm the district court's dismissal of the complaint on the basis of the court-developed principle of abstention, Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and therefore refrain from reaching the merits of this case. In coming to this conclusion we recognize full well that the doctrine of abstention has been narrowly circumscribed when constitutional issues are presented, Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Kirkland v. Wallace, 403 F.2d 413 (5th Cir. 1968); Stickgold, Variations of the Theme of Dombrowski v. Pfister: Federal Intervention in State Criminal Proceedings Affecting First Amendment Rights, 1968 Wis.L.Rev. 369, 380–385, and virtually prohibited in diversity cases where the only difficulty is the unsettled posture of the state law, Meredith v. City of Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943). See *generally* Annot., 20 L.Ed.2d 1623 (1969); 1A Moore, Federal Practice ¶ 0.203 (2d ed. 1965). But this is not a case which appears to involve constitutional issues nor is the difficulty

18. In his answer to appellant's complaint, the Attorney General did not specifically plead this statute, although the Fourth Separate Defense (App. 17a) did indicate that the members of the Board of Managers "were performing acts within the scope of their official authority, in good faith, * * *" and are therefore "immune from any civil liability sought to be imposed upon them by plaintiff." See note 19, *infra*.

19. Whether the members of the Board of Managers, if properly named as defendants, would be personally liable for damages may depend upon the application of state law in determining if their duties are discretionary, quasi-judicial or ministerial. *See* Travis v. Pinto, 87 N.J. Super. 263, 208 A.2d 828 (1965); Kisielewski v. New Jersey, *supra*.

*See also* Godfrey v. Board of Chosen Freeholders of Essex, 65 N.J.Super. 213, 167 A.2d 221 (1961), on liability of an agent of the State for money in his possession clearly belonging to the claimant.

in deciding the case limited to the uncertainty of the state law. This case involves the sensitive problem of the operation and administration of an alleged inmates trust fund in a prison setting.

Professor Wright has stated that:

* * * [A]bstention is variously recognized: (1) to avoid decision of a federal constitutional question where the case may be disposed of on questions of state law; (2) to avoid needless conflict with the administration by a state of its own affairs; (3) to leave to the states the resolution of unsettled questions of state law;[20] and (4) to ease the congestion of the federal court docket. * * * Wright, Federal Courts 169 (1963).

The second and third elements of the abstention doctrine, as defined above, are relevant here, i. e., to avoid interference with New Jersey's administration of its prison system, cf. Gurzynski v. Yeager, supra, and to permit the state courts to determine the status of the trust fund claimed to have been created by the statutes previously discussed and the relationship of the Board of Managers to such fund.

Professor Wright has also noted, quite significantly, that "where the federal court defers to avoid interference with state activities, *dismissal of the action,* rather than retention of jurisdiction pending a state determination, *is normally appropriate.*" (Emphasis added.) *Id.* at 173.[21]

The American Law Institute's Study of the Division of Jurisdiction Between State and Federal Courts would also permit a district court in its discretion to apply the abstention doctrine when the following conditions are met:

(1) * * * the issues of State law cannot be satisfactorily determined in the light of the State authorities; and

(2) * * * abstention from the exercise of federal jurisdiction is warranted * * * by a serious danger of embarrassing the effectuation of State

20. This is consistent with the statement of this court in Howell v. Citizens First National Bank of Ridgewood, 385 F.2d 528, 529 (3d Cir. 1967), by Judge Maris that, * * * [I]t is settled that it may be appropriate for a federal court to decline to exercise its jurisdiction or to postpone such exercise and remit the parties to the state courts in a case which involves a decisive issue of unsettled state law * * *.

Abstention was not applied in *Howell* because we concluded after an examination of the federal and state laws relating to the establishment of branch banks that only a federal question was actually involved. See Handler, Jurisdictional Abstention in Federal-State Branch Bank Conflicts, 19 Rutgers L.Rev. 445 (1965).

We do not believe that appellee's failure to assert the abstention principle below bars our resort to the abstention doctrine on appeal under the circumstances here. In Provident Tradesmen Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968), while concluding that we should not have required the district court to dismiss the declaratory judgment action in that particular diversity case, 365 F.2d 802, 814 (3d Cir. 1966), the Supreme Court did not base its reversal on the fact that we took this action sua sponte. The Court said:

*While we do not now declare that a court of appeals may never on its own motion compel dismissal of an action as an unwarranted intrusion upon state adjudication of state law,* we do conclude that, *this being a discretionary matter,* the existence of a verdict reached after a prolonged trial in which the defendants did not invoke the pending state actions should be taken into consideration in deciding whether dismissal is the wiser course. 390 U.S. at 126, 88 S.Ct. at 746. (Emphasis added.)

No such considerations are present in the instant case, of course.

21. Professor Wright follows this by declaring that * * * If the state court to which deference is thus shown prejudices any federal rights of the parties, this can be redressed by review of the state decision in the United States Supreme Court. *Id.*

For a fuller exposition of Professor Wright's views, see Wright, The Abstention Doctrine Reconsidered, 37 Tex.L. Rev. 815 (1959).

policies by a decision of State law at variance with the view that may be ultimately taken by the State court, or by other circumstances of like character; and

(3) * * * a plain, speedy, and efficient remedy may be had in the courts of such State; and

(4) * * * the parties' claims of federal right, if any, including any issues of fact material thereto, can be adequately protected by review of the State Court decision by the Supreme Court of the United States.[22] § 1371 (c), Final Draft (1969), adopted at the Annual Meeting in 1968. (See Field, Jurisdiction of Federal Courts— A Summary of American Law Institute Proposals, 46 F.R.D. 141, 152 (1969)).

While the American Law Institute's proposal speaks in terms of a stay of the action by the district courts rather than outright dismissal (proposed § 1371 (d)), there is authority for such dismissal, as suggested by Professor Wright. *See* Burford v. Sun Oil Company, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).[23]

In the commentary to the § 1371 proposal the ALI recognizes the difficulty in achieving complete symmetry in the field of abstention:

* * * There is, then, no wholly satisfactory answer. To litigate these cases entirely through the federal courts strains state-federal relations, may make necessary the premature decision of federal constitutional questions, and requires the federal court to pass on questions of state law in circumstances under which an erroneous decision may seriously interfere with state substantive policies. To litigate such cases entirely through the state courts, with review in the United States Supreme Court, deprives plaintiff of federal fact-finding, and of federal protection during the pendency of the state action. To shuttle the cases back and forth from state to federal court, as present doctrines permit, "operates to require piecemeal adjudication in many courts * * * thereby delaying ultimate adjudication on the merits for an undue length of time." Baggett v. Bullitt, 377 U.S. 360, 378–379, [84 S.Ct. 1316, 12 L.Ed. 2d 377.] (1964). Thus, while the proposals put forward in this section are an attempt to improve on the present situation, it is not possible to provide a perfect solution.

* * * * * *

* * * It would be anomalous if judge-made notions of abstention were to be applicable beyond the circumstances set forth in those subsections. In particular, the disadvantages of abstention outweigh any conceivable gain in requiring state determination of state questions *in routine diversity suits between private litigants involving no issue of public law.* Meredith

---

22. While not raising any constitutional issues in his complaint, and expressly disavowing any Civil Rights Act claim, appellant has intimated in his brief that the conduct of the Board of Managers in the "management" of the trust fund may constitute a deprivation of his property rights and that of his fellow prisoners and that the statutes establishing the trust fund are unconstitutional. If appellant prosecutes his claim in the state courts and raises a federal question at some stage of the proceedings, he would, of course, have a right to seek review of an adverse decision in the United States Supreme Court.

23. In Note, Federal Courts' Disposition of Unsettled Questions of State Law, 48 Col.L.Rev. 575, 586–587 (1948), it is pointed out, quite perceptively, that

* * * [I]n the diversity cases, where no federal question is involved, the practical effect of the two techniques [*i.e.*, stay or dismissal] would be indistinguishable since the state determination of the state questions would be conclusive of the controversy. Hence retention of the bill by the district court would be waste motion and dismissal without prejudice would seem the more appropriate procedure. * * *

v. City of Winter Haven, 320 U.S. 228, [64 S.Ct. 7, 88 L.Ed. 9.] (1943): * * * (Emphasis added.) Final Draft, pp. 285, 296.

On balance, we conclude that this case is one in which dismissal is justified. While jurisdiction is asserted on the basis of diversity, this is not a "routine" suit and it does involve serious issues of public law.

In Alabama Public Service Commission v. Southern R'way Co., 341 U.S. 341, 351, 71 S.Ct. 762, 95 L.Ed. 1002 n. 15 (1951), Chief Justice Vinson pointed to language in Chief Justice Stone's opinion in *Meredith* which we believe distinguishes the thrust of the latter ruling:

> * * * Decision here does not require the federal court to determine or shape the state policy governing administrative agencies. It entails no interference with such agencies or with the state courts. * * * 320 U.S. at 237, 64 S.Ct. at 12.

Earlier in the *Meredith* opinion the Court adverted to the exceptional circumstances which would warrant abstention in a diversity case, including the discretion of the federal court to "refuse to appraise or shape domestic policy of the state governing its administrative agencies, * * *." 320 U.S. at 235, 64 S.Ct. at 11.

In his dissent in Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959), in which the majority required a stay of proceedings pending construction of a state statute by the state courts, Justice Brennan said:

> * * * Abstention has * * * been sanctioned on grounds of comity with the States—to avoid a result in "needless friction with state policies." * * * Thus this Court has upheld an abstention when the exercise by the federal court of jurisdiction would disrupt a state administrative process, * * * or otherwise create needless friction by unnecessarily enjoining state officials from executing domestic policies * * *. 360 U.S. at 33, 79 S.Ct. at 1075.

In the majority opinion in Allegheny County v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959), filed the same day, in which abstention was held improper, Justice Brennan said:

> * * * Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest. * * * 360 U.S. at 188–189, 78 S.Ct. at 1063.[24]

24. To the same effect, see Justice Brennan's concurring opinion in Martin v. Creasy, 360 U.S. 219, 225–226, 79 S.Ct. 1034, 3 L.Ed.2d 1186 (1959), also decided the same day, in which abstention was held to be proper.

For a thorough discussion of these three 1959 abstention decisions and other abstention cases decided the same term, and the "doctrinal shock" which they produced, see Note, Abstention: An Exercise in Federalism, 108 U. of Pa.L.Rev. 226 (1959); Note, Judicial Abstention From the Exercise of Federal Jurisdiction, 59 Col.L.Rev. 749 (1959); Kurland, Toward A Co-operative Judicial Federalism: The Federal Court Abstention Doctrine, 24 F.R.D. 481 (1960).

In David P. Currie, The Federal Courts and the American Law Institute—Part II, 36 U.Chi.L.Rev. 268, 315 (1969) the author observes that,

* * * The proposed [ALI] categories of abstention are the accepted ones laid out by Mr. Justice Brennan: There must in any case be an unresolved state-law issue, and in addition either a substantial constitutional question to avoid, "serious danger of embarrassing the effectuation of State policies" by an erroneous decision of state law, or "other circumstances of like character," whatever that means. * * *

Professor Currie does not favor the ALI abstention proposal. In David P. Currie, Federal Courts—Cases and Materials pp. 522–530 (1968), he raises a host of questions which serve to illuminate the problems inherent in the application of abstention in diversity cases.

For an interesting article probing into the postulates of the abstention doctrine, see Liebenthal, A Dialogue on England [v. Louisiana State Board of Medical Ex-

More recently, Justice Brennan, on the basis of "narrowly limited special circumstances," concurred in a per curiam decision of the Supreme Court, reversing the Tenth Circuit, in which abstention was deemed proper in a diversity trespass action involving the novel question of whether a New Mexico statute authorized private coal companies to exercise eminent domain to secure water resources. Kaiser Steel Corp. v. W. S. Ranch Co., 391 U.S. 593, 594, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968).[25]

As previously noted, we have for the purpose of convenience referred to the fund in dispute here as a "trust fund" and to the prisoners as "beneficiaries." However, there is no adjudication by the state courts of New Jersey to give us guidance as to the legal attributes of the fund and what status the prisoners have in relation to it. We are therefore left without any state judicial assistance, directly or by implication, in determining what position the members of the Board of Managers hold with respect to the fund and to the prisoners.[26]

Even if we were convinced that this "trust fund" is governed by the ordinary principles of trust law, it is a most unusual trust, intertwined with the management of the state penal system. It is clear that New Jersey would have an overriding interest in the development of its own policy regarding the establishment of trust funds for inmates of prisons and other state institutions. Normally, when federal courts are called upon to apply trust law in diversity cases, the policies which the state wishes to effectuate are quite clear. Not so here. A decision by a federal court in a barren area of state law that involves several statutes, the New Jersey State Prison and its Board of Managers, as well as general trust principles, may not only embarrass but also severely undercut the effectuation of state policies not yet clearly delineated.[27]

aminers, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964)]: The England Case, Its Effect on the Abstention Doctrine, and Some Suggested Solutions, 18 Case W.Res.L.Rev. 157 (1966).

25. In Schenley Industries, Inc. v. N. J. Wine & Spirit Wholesalers Ass'n., 272 F.Supp. 872 (D.N.J.1967), Judge Coolahan recognized the continuing vitality of the abstention doctrine:

An exception lies in a narrowly specified class of unusual cases when a Federal court may properly abstain from proceeding to decide a matter within its jurisdiction in order to permit State court adjudication of State law and policy involved in the Federal case. * * * * * * * * * * * * The combined effect of * * * [the *Allegheny County* and *Thibodaux*], and later cases, on the *Meredith* holding has perplexed the commentators, but the most persuasive view is that the special nature of certain local proceedings involving State policy prerogatives when joined with difficult questions of State law, warrant abstention, although neither individually would suffice. * * * 272 F.Supp. at 882, 883 n. 17.

The court held in the *Schenley Industries* case that abstention was not appropriate. See Giorgi v. Pa. Labor Relations Board, 293 F.Supp. 873 (E.D.Pa. 1968), where abstention was applied, in reliance on the *Burford* and *Alabama Public Service Commission* decisions, in a case involving the unsettled question of whether employees of mushroom producers were covered by the Pennsylvania Labor Relations Act.

26. It is not certain, e. g., whether the comprehensive guidelines for the conduct of trustees of nontestamentary trusts set out in Donaldson v. Borough of Madison, 88 N.J.Super. 574, 213 A.2d 33 (1965), which appellant has cited, are applicable to the Board of Managers of the New Jersey State Prison.

27. In Harris v. Yeager, 291 F.Supp. 1015 (D.N.J.1968), aff'd per curiam, 410 F.2d 1376 (3d Cir. 1969), in which the district court dismissed a civil rights action challenging the compulsory withholding of part of a prisoner's wages for deposit in a savings account, a practice which as previously noted has been discontinued, the court treated the payment of wages for work performed by prisoners as a wholly discretionary and gratuitous act by the State of New Jersey which gave no vested rights to prison inmates. In

Our decision in no way prejudices the appellant from resorting to the courts of New Jersey to pursue his cause. Indeed, the allegations appellant makes are of such nature that the state's interest in the integrity of its own officials and the prison system should be sufficient reason for New Jersey to provide a plain, speedy, efficient and unbiased remedy.[28]

For the reasons expressed at length above, the dismissal of the appellant's complaint will be affirmed.

---

the district court opinion, Judge Cohen said:

The moneys under consideration are not wages in a realistic economic employer-employee relationship. They are, rather, a gratuitous payment authorized by the State of New Jersey and made by virtue of an administrative policy prompted and advanced in the best interests of penology and sociology. The plaintiff has no inherent legal right to the payment of this gratuity, nor to determine its form or amount. The State Board [of Control of Institutions and Agencies] has been given full power and authority, in the area of internal prison management, to engage healthy and capable inmates in productive occupations and to provide, in its best judgment, compensation therefor, be it cash or remission of time from sentence, or both. In the exercise of this statutory choice, the Board may establish a policy determining how, when, and if cash be selected, the amount, time and method of payment. The Board may, in its discretion and in the best interest of inmates, reasonably impose an enforced savings of a comparatively nominal amount to await the inmate's release or discharge from the institution. 291 F.Supp. at 1017–1018 (footnote omitted).

Perhaps we could likewise decide that the operation and management of the inmates "trust fund" is wholly discretionary and gratuitous on the part of the State of New Jersey and therefore appellant has no right to challenge the way in which the trust fund is administered. Because of the apparent statutory basis for the establishment of the "trust fund" and because of the early recognition by the State Attorney General that the fund does partake of the nature of a trust, note 3, *supra*, we believe this may be a problem different from the payment of compensation for prison work, and we prefer to leave to the New Jersey courts the ultimate determination of the trust issues presented here.

It should be made clear that we are not predicating our dismissal of this suit on the generally-accepted principle of lack of jurisdiction by the federal courts over the administration of testamentary trusts and decedents' estates. For a good discussion of the scope and limitations of this principle, see the opinion of Judge Davis in Martz v. Braun, 266 F.Supp. 134 (E.D.Pa.1967). *See also* Vestal and Foster, Implied Limitations on the Diversity Jurisdiction of the Federal Courts, 44 Minn.L.Rev. 1, 13, 36 (1956), in which the authors indicate that the federal courts have not been reluctant to deal with cases involving charitable trusts.

28. Under the organization of New Jersey's State Government the New Jersey State Prison is one of the institutions under the Department of Institutions and Agencies, headed by a State Board of Control, N.J. S.A. 30:1–2, 30:1–3, 30:1–7. The State Board of Control appoints the Board of Managers for each institution within the Department, including the New Jersey State Prison, N.J.S.A. 30:4–1. By statute the State Board of Control has a continuing interest in and power over the administration of the various institutions and would undoubtedly be concerned with the kind of allegations made by appellant, N.J.S.A. 30:1–12:

The State board shall have power to determine all matters relating to the unified and continuous development of the institutions and noninstitutional agencies within its jurisdiction. It shall determine all matters of policy and shall have power to regulate the administration of the institutions or noninstitutional agencies within its jurisdiction, correct and adjust the same so that each shall function as an integral part of a general system. The rules, regulations, orders and directions issued by the State board or by the commissioner pursuant thereto, for this purpose shall be accepted and enforced by the board of managers having charge of any institution or group of institutions or noninstitutional agencies or any phase of the work within the jurisdiction of the State board.